IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| CRAIG LAURENCE CONKLIN, #A5021908, | ) ) | Civ. No. 19-00087 JMS-RT |
| | ) ) | ORDER DISMISSING FIRST AMENDED COMPLAINT IN PART |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| NOLAN ESPINDA, et al., | ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

## ORDER DISMISSING FIRST AMENDED COMPLAINT IN PART

Before the court is pro se Plaintiff Craig Laurence Conklin's first amended

complaint ("FAC") brought pursuant to 42 U.S.C. § 1983. Conklin alleges that

eleven officials of the Hawaii Department of Public Safety ("DPS") and the

Halawa Correctional Facility ("HCF") violated his constitutional rights under the

First, Fifth, Sixth, Eighth, and Fourteenth Amendments, as well as under the

Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*[1]

For the following reasons, the FAC is DISMISSED in part for Conklin's

failure to state a colorable claim for relief pursuant to 28 U.S.C. §§ 1915(e)(2) and

---

[1] Conklin names: DPS Director Nolan Espinda, Health Director John Doe 1, and Institutions Director John Doe 2; physicians Dr. Toyama, Dr. Yoo, and Dr. Frauens; Administrator Dovie Borgess; ADA Coordinator Mahina Assily; Adult Correctional Officer ("ACO") Captain Snook, Chief of Security ("COS") Lyle Antonio, and Case Manager Francis Mufao in their individual capacities only.

1915A(a).  Conklin may file an amended pleading correcting those claims dismissed without prejudice on or before January 20, 2020.

IN THE ALTERNATIVE:

Conklin may notify the court in writing on or before January 20, 2020, that he will stand on his claims in Count XIV as alleged against Defendant Mufao. Upon receipt of such a notice, the court will issue an order directing service of the FAC, limited to that claim only.

## I. <u>STATUTORY SCREENING</u>

The court must conduct a pre-Answer screening of all prisoners' pleadings pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(a).  Claims or complaints that are frivolous, malicious, fail to state a claim for relief, or seek damages from defendants who are immune from suit must be dismissed.  *See Lopez v. Smith*, 203 F.3d 1122, 1126-27 (9th Cir. 2000) (en banc); *Rhodes v. Robinson*, 621 F.3d 1002, 1004 (9th Cir. 2010).

Screening under §§ 1915(e)(2) and 1915A(a) involves the same standard of review as that under Federal Rule of Civil Procedure 12(b)(6).  *See Wilhelm v. Rotman*, 680 F.3d 1113, 1121 (9th Cir. 2012).  A complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks

omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  The "mere possibility of misconduct" or an "unadorned, the defendant-unlawfully-harmed me accusation" falls short of meeting this plausibility standard.  *Id.* at 678-79; *see also Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  The court must accept the allegations of the complaint as true, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and construe the pleading in the light most favorable to the plaintiff, *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Davis v. Scherer*, 468 U.S. 183 (1984).

Pro se litigants' pleadings must be liberally construed and all doubts should be resolved in their favor.  *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010) (citations omitted).  The court must grant leave to amend if it appears the plaintiff can correct the defects in the complaint, *Lopez*, 203 F.3d at 1130, but if a claim or complaint cannot be saved by amendment, dismissal with prejudice is appropriate. *Sylvia Landfield Tr. v. City of L.A.*, 729 F.3d 1189, 1196 (9th Cir. 2013).

## II. BACKGROUND

Conklin commenced this action on February 19, 2019, while he was incarcerated at HCF.[2]  *See* Compl., ECF No. 1.  The court granted Conklin's Application to Proceed In Forma Pauperis by a Prisoner on March 8, 2019.  *See* ECF Nos. 2 and 4.  On or about April 11, 2019, Conklin was released on parole.  *See* https://www.vinelink.com/#/searchResults/1 (last visited Dec. 10, 2019).

On June 6, 2019, the court dismissed Conklin's original Complaint with leave to amend.  *See* Order, ECF No. 8.  Specifically, the court dismissed constitutional claims for money damages against Defendants named in their official capacities and seeking prospective injunctive relief, as mooted by Conklin's release on parole.  The court explained, however, that official-capacity Defendants were properly named for those claims seeking damages against the State under Title II of the ADA.  The court dismissed claims against inmate Tupuelo, DPS Director Espinda, and Health and Institutions Directors Does 1 and 2, for Conklin's failure to state colorable claims, with leave granted to amend.  Finally, the court severed claims that allegedly occurred at HCCC from claims that allegedly occurred at HCF.

---

[2] Conklin was housed at the Hawaii Community Correctional Center ("HCCC") for six weeks before he was transferred to HCF on 02/22/2018.  *See* Compl., ECF No. 1.

Conklin filed the FAC on August 8, 2019, raising fifteen overlapping claims regarding incidents that occurred at HCF only. ECF No. 11. Conklin alleges that (1) Dr. Toyama, Dr. Yoo, Dr. Frauens, and Health Director John Doe 1 denied him adequate medical care; (2) Director Espinda and Institutions Director John Doe 2 failed to transfer him to a minimum security prison when he was classified as a minimum security inmate, allegedly violating DPS policy, and causing him to be assaulted on two occasions by two higher security inmates housed near him; (3) Borgess improperly denied his grievances concerning the denial of a transfer; (4) ADA Coordinator Assily and Dr. Toyama violated his rights under the ADA by denying him handicap accommodations; (5) Captain Snook and CSO Antonio denied him access to the courts by prohibiting attorney calls in the Special Housing Unit ("SHU"); (6) CSO Antonio obstructed justice and denied him due process by destroying video evidence to support his ADA claim; and (7) ACO Mufao retaliated against him for filing grievances by writing a negative report that resulted in his reclassification to medium custody, which in turn, allegedly resulted in the denial of parole.

Conklin seeks compensatory and punitive damages, and declaratory relief.

### III. <u>DISCUSSION</u>

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

Prison officials generally are not liable for damages in their individual capacities under § 1983 unless they personally participated in the alleged constitutional violations. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "That means the inmate[] must show that each defendant personally played a role in violating the Constitution." *Hines v. Youseff*, 914 F.3d 1218, 1228 (9th Cir. 2019); *Iqbal*, 556 U.S. at 677.

A supervisor may be personally "liable under § 1983 so long as 'there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Rodriguez v. Cty. of Los Angeles*, 891 F.3d 776, 798 (9th Cir. 2018) (quoting *Keates v. Koile*, 883 F.3d 1228, 1242-43 (9th Cir. 2018)).

### A.  **Inadequate Medical Care:  Counts I-IV, VI-IX, XI**

The Eighth Amendment is violated when a prison official acts with deliberate indifference to an inmate's serious medical needs. *Snow v. McDaniel*,

681 F.3d 978, 985 (9th Cir. 2012), *overruled in part on other grounds by Peralta*

*v. Dillard*, 744 F.3d 1076, 1082-83 (9th Cir. 2014); *Wilhelm*, 680 F.3d at 1122;

*Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429

U.S. 97 (1976)).  To state a colorable claim for the denial of adequate medical

care, a plaintiff "must show [(1)] a serious medical need by demonstrating that

failure to treat [his] condition could result in further significant injury or the

unnecessary and wanton infliction of pain," and (2) that "the defendant's response

to the need was deliberately indifferent."  *Wilhelm*, 680 F.3d at 1122 (quoting *Jett*,

439 F.3d at 1096).

"Deliberate indifference is a high legal standard."  *Toguchi v. Chung*, 391

F.3d 1051, 1060 (9th Cir. 2004).  It can be shown by "(a) a purposeful act or

failure to respond to a prisoner's pain or possible medical need, and (b) harm

caused by the indifference."  *Wilhelm*, 680 F.3d at 1122 (quoting *Jett*, 439 F.3d at

1096).  The requisite state of mind is one of subjective recklessness, which entails

more than ordinary lack of due care.  *Snow*, 681 F.3d at 985 (citation and

quotation marks omitted); *Wilhelm*, 680 F.3d at 1122.  To establish deliberate

indifference from a delay in providing care, a plaintiff must show that the delay

was harmful.  *See Hallett v. Morgan*, 296 F.3d 732, 745-46 (9th Cir. 2002); *cf.*

*Jett*, 439 F.3d at 1096 ("A prisoner need not show his harm was substantial;

however, such would provide additional support for the inmate's claim that the defendant was deliberately indifferent to his needs.").

"A difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow*, 681 F.3d at 987 (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)); *Wilhelm*, 680 F.3d at 1122 (citing *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1986)). Rather, a plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to [his] health." *Snow*, 681 F.3d at 988 (citation and internal quotation marks omitted).

"Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106; *Snow*, 681 F.3d at 987-88; *Wilhelm*, 680 F.3d at 1122. Even a medical provider's gross negligence does not constitute an Eighth Amendment violation. *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990).

### 1.     Counts I and XI:  Dr. Toyama

Dr. Toyama examined Conklin upon his entry into HCF on February 22, 2018. Conklin requested the opiate pain medication that he had been prescribed

before he was incarcerated to alleviate his chronic pain.[3]  Dr. Toyama instead prescribed Gabapentin to Conklin.  FAC, ECF No. 11 at PageID #94, 104. Conklin complains that other inmates were given their "previous prescription pain medication," and that Dr. Toyama's denial caused him pain, insomnia, and anxiety.  *Id.* at PageID #94.  Several months later, Conklin alleges that he developed burns in his throat and mouth because the Gabapentin was dispensed dissolved in water.[4]  *Id.* at PageID #104.  When Conklin was denied undissolved Gabapentin capsules, he discontinued taking it.  *Id.*  He alleges Dr. Toyama violated the Eighth Amendment by prescribing Gabapentin instead of the opiate medication he requested.  *Id.*

Dr. Toyama apparently prescribed Gabapentin to Conklin to address his chronic pain because Conklin had told prison authorities that he was addicted to his previous opiate medication.[5]  Moreover, Conklin had not taken that medication for at least six weeks since his incarceration.  Conklin does not allege that he told

---

[3] HCCC medical staff denied Conklin's request for this opiate medication six weeks earlier, but told him that they would closely monitor him for opiate withdrawal symptoms.  *See* Compl., ECF No. 1 at PageID #8.

[4] Conklin alleges this is an unauthorized method of delivery for Gabapentin.

[5] *See* https://www.cdc.gov/drugoverdose/pdf/nonopioid_treatments-a.pdf ("Nonopioid Treatments for Chronic Pain"); https://www.pewtrusts.org/en/research-and-analysis (discussing Gabapentin's use as an opiate alternative and "to ease the symptoms of drug and alcohol detoxification" ).

Dr. Toyama (1) about the side effects he experienced after several months of taking Gabapentin dissolved in water; (2) of his continuing pain; or (3) that he had stopped taking Gabapentin, and that Dr. Toyama denied him any alternative pain relief. Without such facts, Conklin fails to show that Dr. Toyama was, subjectively deliberately indifferent to his serious medical needs.

Counts I and XI as alleged against Dr. Toyama for denying Conklin his previous opiate medication are DISMISSED with leave granted to amend.

### 2.    Count I:  Health Director John Doe 1

Conklin alleges that Health Director John Doe 1 "allowed" the practice of denying opiate pain medication "to continue in violation of policy." FAC, ECF No. 11 at PageID #94. He does not identify the policy to which he refers.

A supervisor may "be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Keates*, 883 F.3d at 1243 (quoting *Starr*, 652 F.3d at 1208). A colorable supervisor-liability claim must show that the supervisor personally participated in the alleged deprivation, knew of the violation and failed to prevent it, or "implement[ed] a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving

force of the constitutional violation." *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989) (internal citations and quotation marks omitted)); *Taylor*, 880 F.2d at 1045.

Conklin alleges no facts suggesting that John Doe 1 personally participated in or was even aware that Dr. Toyama prescribed Conklin Gabapentin in lieu of opiate medication, which, in any case, was not a constitutional violation. Nor does Conklin allege facts that show that John Doe 1 implemented a medical policy that was so deficient that it violated Conklin's constitutional right to adequate medical care. He does not explain what this unidentified policy requires, or how Dr. Toyama's medical decision violated it.

Conklin fails to allege facts showing John Doe 1's personal involvement in his medical care claims. Count I as alleged against Health Director John Doe 1 is DISMISSED with leave granted to amend.

### 3. *Count II: Dr. Toyama*

At his entry examination, Conklin told Dr. Toyama that he had been diagnosed with diverticulosis[6] before he was incarcerated by "positive hemocult

---

[6] Diverticulosis is a "common condition" believed to be caused by a low fiber diet that develops "when pockets called diverticula form in the walls of your digestive tract." https://www.webmd.com/digestive-disorders. It is usually monitored and treated with a change in diet, fiber supplements, probiotics, and weight loss. *Id.*

card tests, and [a] CAT scan" and requested a colonoscopy. FAC, ECF No. 11 at

PageID #95. Dr. Toyama denied Conklin's request for a colonoscopy "to

diagnose [his] serious medical condition." *Id.* These facts only show that,

although Conklin had been tested and diagnosed with diverticulosis before he was

incarcerated, Dr. Toyama did not believe that a colonoscopy was medically

necessary when Conklin arrived at HCF. Further, Conklin does not allege that the

denial of a colonoscopy caused him further significant injury, beyond his anxiety

that he did not receive one.

Conklin's disagreement with Dr. Toyama's decision is insufficient to allege

a colorable claim that Dr. Toyama was subjectively, deliberately indifferent to

Conklin's serious medical needs. Count II is DISMISSED with leave to amend.

### 4.    *Count III:  Dr. Yoo*

On February 28, 2018, Dr. Yoo extracted Conklin's tooth using a local

anesthetic. *Id.* at PageID #96. Conklin says a large piece of his jaw bone broke

off during this procedure. Conklin returned to the HCF dental unit the next day

and asked for his previous opiate pain medication. Dr. Yoo, like Dr. Toyama,

denied this request. Conklin alleges this caused him "chronic dental" and throat

pain, headaches, and the inability to swallow, chew, or brush his teeth for forty

days. *Id.*

Conklin began taking Gabapentin a week before this extraction.  Dr. Yoo would have been aware of this, and of Conklin's admitted opiate addiction. Conklin does *not* allege that Dr. Yoo refused him additional or alternative pain medication, whether prescription or over the counter, or failed to monitor his recovery.  Conklin alleges only that Dr. Yoo denied him opiate medication the day after his tooth was extracted.  This is insufficient to plausibly infer that Dr. Yoo was subjectively, deliberately indifferent to Conklin's pain or serious medical needs.  Count III is DISMISSED with leave granted to amend.

### 5.    *Count IV:  Dr. Frauens*

On April 3, 2018, an outside orthopedic specialist, Dr. Frauens, examined Conklin to evaluate his requests to receive the same orthopedic care and opiate medication that he had before he was incarcerated.  *Id.* at PageID #97.  Conklin does not explain what type of orthopedic care he had previously received.  He states, "Dr. Frauens explained in lengthy detail . . . the severity of multiple serious injuries which require not only orthopedic care/surgery, but also the need for prescription pain medications to control the chronic pain plaintiff was suffering from."  *Id.*  After this examination, Dr. Frauens determined that Conklin's previous orthopedic care and opiate pain medication could be deferred until Conklin's release.

Conklin does not allege that Dr. Frauens denied him *any* pain relief, prescription or otherwise.  He alleges only that Dr. Frauens did not agree that he required his opiate prescription and whatever type of orthopedic care he had been getting.  Conklin does not explain what type of orthopedic care he sought, who prescribed this care, or why.  It is therefore impossible to infer that Dr. Frauens was deliberately indifferent to Conklin's serious medical needs when he deferred such care.  Even if Conklin's outside medical provider had recommended surgery or some other specific orthopedic treatment (which is not evident here), this is a disagreement between medical professionals, and standing alone, insufficient to show that Dr. Frauens was deliberately indifferent to Conklin's serious medical needs.  Although Conklin alleges the denial of orthopedic care and opiate medication continued his pain, caused him anxiety, insomnia, and difficulty moving, he alleges no facts showing the delay resulted in further, significant harm.

These facts do not support a plausible inference that Dr. Frauens acted with deliberate indifference to Conklin's serious medical needs.  Count IV is DISMISSED with leave to amend.

### 6.    *Counts VI, VII:  Dr. Toyama*

On or about June 26, 2018, Conklin was assaulted by another inmate while he watched television in his housing module.  FAC, ECF No. 11 at PageID #98-99

(Count VI). He was taken immediately to the Pali Momi Medical Center emergency room and treated for contusions and facial trauma. Conklin's discharge instructions recommended that he return or see a specialist if "persistent trauma" occurred. *Id.* at PageID #99. Conklin says that he was not seen within twenty-four hours of his discharge, as recommended, or taken to a specialist when he complained of pain. He does not say, however, that he was not seen by HCF medical providers.

Dr. Toyama examined Conklin on July 10, 2018, within two weeks of the assault, and explained that his continuing jaw pain, tinnitus,[7] blurry vision, and lack of concentration were normal after this type of trauma. Although Dr. Toyama declined to authorize outside specialist care at that time, he referred Conklin to The Queen's Medical Center ("QMC") dental clinic within two months, when Conklin continued to complain of these adverse effects. Conklin was seen at QMC on or about September 18, 2018, where a maxillofacial surgeon diagnosed "T.M.J. dislocation[8] and tinnitus" and recommended that he see an "E.N.T." (ear,

---

[7] "Tinnitus is the perception of noise or ringing in the ears . . . [that] affects about 15 to 20 percent of people. Tinnitus. . . [is] a symptom of an underlying condition, such as age-related hearing loss, ear injury or a circulatory system disorder. Although bothersome, tinnitus usually isn't a sign of something serious." https://www.mayoclinic.org/diseases-conditions/tinnitus.

[8] TMJ dislocation occurs when the temporomandibular "becomes dislocated when the condyle moves too far" and the jaw locks in an open position. https://www.cogate.com/en-

(continued...)

nose, and throat) specialist or rheumatologist. *Id.* at PageID #100 (Count VII).

Conklin complains that Dr. Toyama did not refer him to these specialists.

"Dental care is one of the most important medical needs of inmates," *Hunt v. Dental Dept.*, 865 F.2d 198, 200 (9th Cir.1989) (citation omitted), but "[d]elay in providing a prisoner with dental treatment, standing alone, does not constitute an Eighth Amendment violation unless the delay causes harm." *Amarir v. Hill*, 243 F. App'x 353, 354 (9th Cir. 2007) (citing *Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985)).

Further, Dr. Toyama's alleged failure to refer Conklin to these outside providers is insufficient, standing alone, to raise a claim for relief, because an "inmate has no independent constitutional right to outside medical care additional and supplemental to the medical care provided by the prison staff within the institution." *Roberts v. Spalding*, 783 F.2d 867, 870 (9th Cir. 1986); *see Redwine v. Branch*, 703 F. App'x 465, 465 (9th Cir. 2017); *Amarir*, 243 F. App'x at 354; *Jenkins v. Little*, 2019 WL 5073561, at *5 (D. Idaho Oct. 9, 2019); *Arzaga v. Lovett*, 2015 WL 4879453, at *4 (E.D. Cal. Aug. 14, 2015) (finding that plaintiff's preference for a second opinion is "not enough to establish defendant's deliberate

---

[8](...continued)
us/oral-health/conditions. It usually resolves after an oral adjustment. *Id.*

indifference" as the allegation does "not show that defendant knowingly disregarded a serious risk of harm to plaintiff" nor that defendant "exposed plaintiff to any serious risk of harm"). Conklin fails to allege facts showing that his tinnitus and TMJ conditions were "serious medical need[s]," and that the failure to refer him to these specialists caused additional "significant injury" or the "unnecessary and wanton infliction of pain." *Wilhelm*, 680 F.3d at 1122.

This chronology does not allow the plausible inference that Dr. Toyama or HCF medical staff were deliberately indifferent to Conklin's serious medical needs after his assault. Conklin was treated at Pali Momi immediately after the assault. Although he allegedly was not seen within twenty-four hours of his discharge, he states that his injuries were "documented by xray, CAT scan, and *multiple* follow up exams," and that he was examined within two weeks by Dr. Toyama. He was then referred to and treated at the QMC dental clinic. FAC, ECF No. 11 at PageID #100. Conklin received continued, extensive medical and dental treatment.

Nor does Conklin allege that the delay in being seen at the QMC dental clinic, or by an ENT specialist or rheumatologist caused him further harm. He does not allege that either TMJ dislocation or tinnitus are serious medical conditions that required additional specialist care to prevent further injury, beyond

17

what he received at QMC and HCF.  *See Amarir*, 243 F. App'x at 354 ("A prison inmate also does not have a right to treatment for conditions that are not readily amenable to treatment, including TMJ.").  Rather, Conklin states that he was told that his tinnitus and TMJ dislocation were "untreatable and possibly permanent." FAC, ECF No. 11 at PageID #98.  Conklin does not assert that Dr. Toyama denied him any specialist-recommended treatment for TMJ disorder or tinnitus while at HCF.

Conklin fails to allege a colorable claim showing that Dr. Toyama was deliberately indifferent to his serious medical needs after his assault or by delaying additional outside specialist care for tinnitus or TMJ disorder.  Counts VI and VII are DISMISSED with leave to amend.

### 7.    *Count VIII:  Dr. Toyama*[9]

Conklin claims that he had active, medical needs memoranda authorizing him to use crutches and/or a wheelchair;[10] a handicap accessible shower; and restrictions on standing for long periods, walking long distances, and using stairs. *See* FAC, ECF No. 11 at PageID #101.  He does not say who authorized these

---

[9] To the extent Conklin also raises these claims against Dr. Toyama under the ADA, they are addressed separately.

[10] Conklin originally alleged that an HCCC nurse confiscated his personal crutches and denied him the use of a cane, crutches, or a wheelchair.  *See* Compl., ECF. No. 1 at PageID #9. He does not state who later authorized these medical memoranda.

memoranda or when they went into effect. On August 6, 2018, Conklin was moved to the SHU for thirty days, as a misconduct sanction. *Id.* He says special needs memoranda are not honored at the SHU and it has no disability accommodations. *Id.*

On August 8, 2019, Conklin asked the medical unit for confirmation of his handicap accessible shower memorandum. The next day, Dr. Toyama issued Conklin a new medical memorandum that discontinued accommodations for a handicap shower; his other memoranda remained in place. *Id.* On August 10, 2019, SHU staff escorted Conklin to the non-handicap accessible SHU shower. Although Conklin told them that he had active medical memoranda restricting extended walking or standing, they left him in the non-handicap stall, which was not equipped with handles or a seat, unmonitored for forty-five minutes. When they returned to escort Conklin to his cell, he fell from a 12" step as he exited the shower unassisted. *Id.* (Count VIII). Conklin was taken to the medical unit and treated. He alleges that Dr. Toyama was deliberately indifferent to his serious medical needs by rescinding his memorandum for a handicap shower. *Id.*

First, Dr. Toyama had personally treated Conklin since his arrival at HCF. Dr. Toyama therefore had access to Conklin's institutional medical records and his own observations upon which to determine whether Conklin required a handicap

shower.  Second, Conklin does not explain standard SHU procedures regarding

showers—that is, whether SHU inmates are escorted to and from the shower and

monitored while there, or whether they were commonly left unattended in the

shower for extended periods.

Regardless, Conklin does *not* allege that Dr. Toyama knew that Conklin

would be left unattended in the SHU shower for forty-five minutes, or that there

was a 12" step down from the shower, or that he would be given no assistance

exiting the shower, when he rescinded the handicap shower authorization but left

intact restrictions on Conklin's extended standing or walking.  These facts are

insufficient to show that Dr. Toyama was subjectively, deliberately indifferent to a

serious risk of harm to Conklin when he rescinded his handicap accessible shower

memorandum.  Count VIII is DISMISSED with leave to amend.

### 8.    *Count IX:  Dr. Toyama*

On September 4, 2018, the day before Conklin left the SHU, Dr. Toyama

discontinued Conklin's medical-needs memoranda for stair restrictions, crutches,

or a wheelchair.  FAC, ECF No. 11 at PageID #102.  Conklin claims that there was

no change in his medical condition to support this decision and that Dr. Toyama's

decision was contrary to Dr. Frauens' statement that they should "eliminate

anything that would make [Conklin's] conditions worse."  *Id*. at PageID #102-03.

Conklin's requests to reinstate his medical memoranda and grievances on the issue were denied. Conklin says this increased his chronic pain, decreased his mobility, aggravated his long-standing and documented medical conditions, and interfered with his ability to walk, stand, lie down, use the toilet, and dress. *Id.*

These allegations fail to show that Dr. Toyama acted with subjective, deliberate indifference to Conklin's serious medical needs. First, Conklin does not say that he required a wheelchair *before* he was incarcerated or that he was ever issued one at HCF. Rather, he earlier stated that he arrived at HCCC with personal crutches that were confiscated; he does not explain when or by whom they were authorized. Nor does he state what explanation he received when the memoranda were rescinded, or whether the decision was Dr. Toyama's alone, or issued after a review by the prison's panel of medical providers.

This claim is significant for what Conklin does not allege. He does not claim that he was required to use stairs, stand, or walk for *extended* periods without assistance after these memoranda were rescinded. He does not allege that he was forced to perform tasks beyond his ability, or that he was assigned to a top bunk, or an upstairs module. Nor does he explain how a discontinuation on stair restrictions, crutches, or a wheelchair interfered with his ability to use the toilet in his cell, lie down, or dress himself. Conklin fails to plausibly allege that he

suffered further harm after the remaining memoranda were rescinded.  Count IX is DISMISSED with leave to amend.

## B.    Denial of Transfer and Grievance; Failure to Protect:  Counts V & XV

Conklin concludes that, because a DPS policy requires inmates to be housed in the least restrictive environment according to their custody level, prison officials were required to transfer him to a minimum security prison when he was classified as minimum security in April 2018.  FAC, ECF No. 11 at PageID #98.  Conklin alleges that Director Espinda and Institutions Director John Doe 2 failed to protect him from harm because: (1) his transfer requests were denied; and (2) he was exposed to "close supervision" inmates who assaulted him on June 26, 2018 and February 10, 2019.  *See Id.* (Count V); *id.* at PageID #109-10 (Count XV).  Conklin further alleges that grievance Administrator Borgess violated his rights when she denied his grievances regarding the denial of a transfer.[11]  *Id.* at PageID #98.

### *1.    Count V:  Denial of Transfer*

Conklin does not specify who denied his transfer request, or whether Espinda or John Doe 2 were aware of his request.  In any event, inmates have no

_____

[11] Conklin also alleges that a guard was grossly negligent when he failed to prevent a Module 4 close custody inmate from entering Conklin's cell in Module 3 and assaulting him, and then took four minutes to open the doors to allow other officers to rescue him.  FAC, ECF No. 11 at PageID #109.  Conklin does not allege a separate claim against this guard, however.

constitutional right to be housed at a particular institution, *Meachum v. Fano*, 427

U.S. 215, 224 (1976), to receive a particular security classification, *Moody v.*

*Daggett*, 429 U.S. 78, 88 n.9 (1976); *Hernandez v. Johnston*, 833 F.2d 1316, 1318

(9th Cir. 1987), or to be housed in a less restrictive section of a facility, *Grayson v.*

*Rison*, 945 F.2d 1064, 1067 (9th Cir. 1991) (constitution imposes few restrictions

on legitimate administrative authority in housing decisions). Regardless of who

denied Conklin's request to transfer, or whether Espinda and John Doe 2 approved

that denial, Conklin had no Eighth Amendment right to be transferred.

And, even if DPS has a policy that requires inmates be held "in the least

restrictive environment according to custody level," that does not mean that

minimum security inmates are prohibited from being held at HCF or that they must

be housed in a minimum security facility.[12] FAC, ECF No. 11 at PageID #98. It

means that minimum security inmates are subject to less supervision and given

greater privileges than higher security inmates in the same facilities.

To the extent Count V challenges the denial of Conklin's request to transfer,

it fails to state a claim and is DISMISSED without leave to amend.

---

[12] *See* DPS Corrections Administration Policy and Procedures ("P &P"), COR
18.01.2.2.h, https://dps.hawaii.gov/policies-and-procedures/pp-cor. ("A single facility may have
more than one level of security within its perimeter.").

## 2.     Count V:  Denial of Grievance

Defendant Borgess denied Conklin's grievances regarding the denial of his request for a transfer.  Because Conklin had no right to a transfer, Borgess' denial of his grievance appeal did not violate his rights.  Moreover, claims based solely on the denial of a grievance generally do not state a claim, because inmates have no "separate constitutional entitlement to a specific prison grievance procedure." *Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003) (citing *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988)); *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007) ("Ruling against a prisoner on an administrative complaint does not cause or contribute to the violation."); *Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993) (prison official's involvement in administrative appeals process cannot serve as a basis for liability in a Section 1983 action); *Lewis v. Ollison*, 571 F. Supp. 2d 1162, 1170 (C.D. Cal. 2008) ("Participation in the prison grievance process does not give rise to a cause of action.").

To the extent Count V challenges Borgess' denial of his grievance, it is DISMISSED without leave to amend.

///

///

///

### 3.    Counts V & XV:  Failure-to-Protect

Conklin alleges that, because he was denied a transfer to a minimum security facility, he was housed near close custody inmates.  He concludes that the denial of a transfer constituted a failure to protect him from assault.

"The Eighth Amendment imposes a duty on prison officials to protect inmates from violence at the hands of other inmates." *Cortez v. Skol*, 776 F.3d 1046, 1050 (9th Cir. 2015).  To state an Eighth Amendment claim, an inmate must show that prison officials acted with deliberate indifference to the threat of serious harm or injury to him.  *See Labatad v. Corr. Corp. of Am.*, 714 F.3d 1155, 1160 (9th Cir. 2013); *see also Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986) (stating same with respect to harm inflicted by another inmate).  Deliberate indifference occurs when an official acts or fails to act despite their subjective knowledge of a substantial risk of serious harm.  *Farmer v. Brennan*, 511 U.S. 825, 841 (1994); *Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009); *Hearns v. Terhune*, 413 F.3d 1036, 1040 (9th Cir. 2005).  The "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Gordon v. Sequeira*, 2018 WL 1020113, at *4 (D. Haw. Feb. 22, 2018).

A prison official need not "believe to a moral certainty" that an inmate is at risk of harm "before [he] is obligated to take steps to prevent such an assault," but he or she must have more than a "mere suspicion" that an attack will occur. *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986). "[S]peculative and generalized fears of harm at the hands of other prisoners do not rise to a sufficiently substantial risk of serious harm." *Williams v. Wood*, 223 F. App'x 670, 671 (9th Cir. 2007).

Conklin alleges no facts showing that Espinda and John Doe 2 subjectively knew that Conklin faced a substantial risk of serious harm by his housing assignment at HCF or from the two close custody inmates who assaulted him, yet failed to take measures to alleviate his risk. That is, Conklin does not allege that *he* had any specific, non-speculative reason to fear assault by these two close custody inmates, or in his housing module, *that he alerted* Espinda, John Doe 2, or *any* HCF or DPS official of facts supporting his reasonable fear of assault (or facts showing that these officials were otherwise made aware of such risk), yet was denied protection or separation from these inmates.

Conklin also states that DPS regulations require close custody inmates to wear bright red uniforms, so that they can be distinguished easily from other inmates and more closely monitored. *See* FAC, ECF No. 11 at PageID #109. But this simply shows that Espinda and John Doe 2 implemented policies to ensure

that close custody inmates were subject to heightened supervision in an effort to protect lower security inmates.[13]

Conklin fails to state a colorable claim against Director Espinda and Institutions Director John Doe 2 for the failure to protect him from harm and Counts V and XV are DISMISSED with leave to amend regarding this allegation only.

## C.   Restricted Telephone Calls:  Count XII

While in the SHU from August 6 to September 5, 2018, Conklin requested to call his attorney daily; these requests were denied.  Eventually, Captain Snook told Conklin that COS Antonio had restricted *all* outgoing telephone calls from the SHU, but Conklin could write to his attorney.  Conklin says this prevented him from conferring with his attorney "for the preparation of legal work for [his] appeal due in just a few weeks," and to defend against his misconduct charge, for which he was found guilty and sanctioned to thirty-days in the SHU.  FAC, ECF No. 11 at PageID #105.  He alleges this restriction violated the First, Fifth, Eighth, and Fourteenth Amendments.

---

[13] DPS Corrections Administration P&P, COR 18.01.4.2, details heightened security measures for close custody inmates.  https://dps.hawaii.gov/policies-and-procedures/pp-cor.

"Although prisoners have a First Amendment right to telephone access, this right is subject to reasonable limitations arising from the legitimate penological and administrative interests of the prison system." *Johnson v. California*, 207 F.3d 650, 656 (9th Cir. 2000) (citing *Strandberg v. City of Helena*, 791 F.2d 744, 747 (9th Cir. 1986)); *Halvorsen v. Baird*, 146 F.3d 680, 689 (9th Cir. 1998). A regulation that impinges on an inmate's First Amendment rights is valid if it "is reasonably related to legitimate penological interests." *Frost v. Symington*, 197 F.3d 348, 354 (9th Cir. 1999) (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

Under *Turner*, to determine the reasonableness of a prison restriction, courts examine four factors:

(1)     whether there is a valid, rational connection between the restriction and the legitimate governmental interest put forward to justify it;

(2)     whether there are alternative means of exercising the right;

(3)     whether accommodating the asserted constitutional right will have a significant negative impact on prison guards and other inmates, and on the allocation of prison resources generally; and

(4)      whether there are obvious, easy alternatives to the restriction showing that it is an exaggerated response to prison concerns.

482 U.S. at 89-90.

Under the first *Turner* factor, a valid prison regulation must be legitimate, neutral, and rationally related to the underlying governmental objective. *See*

*Thornburgh v. Abbott*, 490 U.S. 401, 414 (1989). If prison administrators "might reasonably have thought that the policy would advance [prison] interests," the *Turner* standard is met. *Mauro v. Arpaio*, 188 F.3d 1054, 1060 (9th Cir. 1999). It appears that the governmental objective of the telephone restriction here is related to disciplinary and security concerns in the SHU, and thus, reasonable, but the court will not speculate on the sparse facts that Conklin alleges.

To address "whether there are alternative means of exercising the right," *Turner*, 482 U.S. at 90, courts must first identify the "right" at issue, *Thornburgh*, 490 U.S. at 417. To the extent that Conklin complains that *all* outgoing calls were restricted while he was in the SHU, the right at issue is the ability under the First Amendment "to communicate with persons outside prison walls," and "a telephone provides a *means* of exercising this right." *Valdez v. Rosenbaum*, 302 F.3d 1039, 1048 (9th Cir. 2002) (emphasis in original). Conklin does *not* allege that he was prevented from writing to his attorney (or others), or that he was denied legal calls *from* or *legal visits with* his attorney while in the SHU. Thus, it appears that alternative means of contact with his attorney and others were available.

To the extent that Conklin alleges the right at issue was the right to confer with *any* attorney before or during his prison disciplinary hearing, prisoners have

no such right, thus, his constitutional right to due process was not violated by the restriction. *See Wolff v. McDonald*, 418 U.S. 539, 556, 570 (1974) (explaining that counsel is not generally required for discipline hearings, and stating that illiterate inmates should be given assistance from staff or another inmate).

To the extent Conklin alleges that the telephone restriction interfered with his right to an attorney during his state criminal appeal, he alleges no prejudice to that appeal because of the restriction. *See United States v. Hernandez*, 937 F.2d 1490, 1493 (9th Cir. 1991) (stating that a government intrusion on the right to an attorney "is not sufficient by itself to cause a Sixth Amendment violation. The defendant must have been *prejudiced* by such actions"). Conklin's attorney filed the notice of appeal and the opening brief on appeal in *State v. Conklin*, CAAP-18-0000137 (Haw. App.), on March 9 and July 18, 2018, respectively, both long before Conklin entered the SHU. *See* http://www.courts.state.hi.us. (last visited Dec. 10, 2019). The State filed its Answering Brief on September 26 and Conklin's attorney filed his Reply Brief on October 22, 2018, both events *after* Conklin was released from the SHU.[14] It is impossible to plausibly conclude that

---

[14] The Hawaii Intermediate Court of Appeals affirmed Conklin's conviction on February 12, 2019, and judgment was entered on July 17, 2019. Conklin has not sought further review by the Hawaii Supreme Court.

Conklin's appeal was prejudiced by the restriction on calls to his attorney while he was in the SHU.

To the extent that Conklin asserts that the telephone restriction interfered with his access to the court in his criminal proceedings, he fails to state a claim because having appointed counsel in a criminal case is considered proof of adequate access to the courts in criminal cases. *See United States v. Wilson*, 690 F.2d 1267, 1272 (9th Cir. 1982) (holding no Fifth Amendment violation when prisoner was denied access to law library to research underlying criminal charge, but had access to court-appointed counsel in the criminal proceeding); *Terwilleger v. Washington*, 2018 WL 6331621, at *3 (W.D. Wash. Oct. 30, 2018), *report and recommendation adopted by* 2018 WL 6329307 (W.D. Wash. Dec. 3, 2018).

Finally, to the extent Conklin alleges a denial of access to the court in an unidentified civil case, such access entails only "the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts." *Lewis v. Casey*, 518 U.S. 343, 354, 356 (1996). To have standing to sue for the denial of access in a civil case, a plaintiff must *plead* and *show* an "actual injury," that is, "actual prejudice with respect to contemplated or existing litigation, such as the inability to meet a filing deadline or to present a claim." *Id.* at 348 (citation omitted); *Christopher v. Harbury*, 536 U.S. 403, 412-13 (2002).

Conklin alleges no facts supporting an actual injury to a current or contemplated civil action.

Conklin alleges insufficient facts to plausibly allege that the restriction on telephone calls in the SHU, including legal calls, violated his constitutional rights and Count XII is DISMISSED with leave to amend.

## D.    Destruction of Video Evidence:  Count XIII

In October 2018, Conklin asked COS Antonio to isolate and preserve the video evidence from the security cameras that recorded the SHU shower area on August 10, 2018 (the date Conklin fell after taking a shower).  FAC, ECF No. 11 at PageID #106.  Conklin says that an officer later told him that he had seen the videotape of Conklin's fall in December 2018.  *Id.*  On or about December 17, 2018, however, Antonio told Conklin that the SHU security cameras in the shower area were being repaired on August 10, 2018, and that there was no videotape of Conklin's fall, although Antonio said that Conklin's attorney could request a copy of the report on the incident.  *Id.*  Conklin concludes that Antonio destroyed the videotape to obstruct justice and violate his right to due process.  *Id.*

The Due Process Clause of the Fourteenth Amendment prohibits the government from depriving "any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV § 1.  To plead a procedural due process

violation, a plaintiff must allege two elements: (1) that he has a "liberty or property interest which has been interfered with by the State"; and (2) that the procedures employed to deprive the plaintiff of liberty or property were constitutionally insufficient. *Ky. Dep't. of Corr. v. Thompson*, 490 U.S. 454, 460 (1989). Conklin had no discernible liberty or property interest in the video, thus, he had no right to procedural due process.

Moreover, Conklin has other means to prove that he fell. Conklin's personal and institutional medical records can substantiate that Conklin was disabled, was denied a handicap accessible shower or proper assistance by his escorts, and therefore fell from the SHU shower and incurred injuries. He can request photographic evidence showing that the SHU shower lacked disability accommodations, and he can depose the guards who escorted him to and from the shower to prove that he was unattended for forty-five minutes. Conklin's pure speculation that Antonio destroyed the video is insufficient to state a due process claim. Count XIII is DISMISSED with leave to amend.

## E.    **Retaliation**:  **Count XIV**

Conklin met with his new case manager, Francis Mufao, on September 10 and 15, 2018. FAC, ECF No. 11 at PageID #107. Mufao allegedly told Conklin that he was a non-compliant trouble maker and complainer at the second meeting,

and said that Conklin must complete several RAD[15] programs before his first

parole hearing in six weeks to be positively considered for parole.  *Id.*  Conklin

explained that he could not complete these programs in six weeks due to his

disabilities.  He also told Mufao that he had a high school diploma and did not

need to participate in a GED certificate program, which was one of the programs

Mufao had assigned him.  *Id.*  Conklin argued that he was not required to

participate in many of the programs Mufao assigned.  Mufao told Conklin that he

would not recommend him for parole if he failed to comply.  Conklin then filed a

grievance against Mufao.  *Id.*

    At some point, Mufao charged Conklin with "being non compliant with

RAD programs."  *Id.*  Conklin was found guilty, incurred points, and was

reclassified to medium security status.  On October 17, 2018, Mufao completed a

"character and performance" report, that detailed Conklin's first misconduct

charge and thirty-day sanction, his second misconduct charge for refusing to

participate in or complete RAD programs, and his recent reclassification to

medium security.  *Id.* at PageID #108.  Mufao allegedly referred to Conklin's

---

[15] The DPS Policy and Procedures Manual defines RAD as the "Reception, Assessment, and Diagnostic (RAD) Unit," in which an inmate's case manager assesses an inmate's record to establish a "Prescriptive Plan" for activities and programs to address problems and enhance the inmate's reentry into the community through activities and programs.  Available at https://dps.hawaii.gov/wp-content/uploads/2012/10/COR.14.03.

many grievances in the report.[16]  *Id.*  The report was given to the HPA, which referred to it at Conklin's November 19, 2018 parole hearing.  Conklin was denied parole, and now alleges that Mufao retaliated against him for filing grievances.  *Id.*

"Prisoners have a First Amendment right to file grievances against prison officials and to be free from retaliation for doing so."  *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012) (citing *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009)).  To prevail on a retaliation claim, a prisoner must establish that he was "retaliated against for exercising his constitutional rights and that the retaliatory action does not advance legitimate penological goals, such as preserving institutional order and discipline."  *Barnett v. Centoni*, 31 F.3d 813, 815-16 (9th Cir. 1994) (per curiam) (citation omitted).  Thus, a prisoner must set forth: "(1) [a]n assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."  *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005); *accord Watison*, 668 F.3d at 1114-15; *Silva v. Di*

---

[16] Conklin says that he filed "no less than 35 grievances at HCF" between February and December 2018.  FAC, ECF No. 11 at PageID #107.

*Vittorio*, 658 F.3d 1090, 1104 (9th Cir. 2011), *overruled on other grounds Richey*

*v. Dahne*, 807 F.3d 1202, 1209 n.6 (9th Cir. 2015); *Brodheim*, 584 F.3d at 1269.

Conklin sufficiently alleges that Mufao took an adverse action against him

after he filed grievances against others and against Mufao. *See Watison*, 668 F.3d

at 1114 (stating that retaliatory intent can be inferred from a plausible chronology

of events because direct evidence can rarely be pleaded in a complaint). That

alleged action "would chill or silence a person of ordinary firmness from future

First Amendment activities." *Robinson*, 408 F.3d at 568-69 (internal quotation

marks and emphasis omitted). The court leaves it to adversarial proceedings to

determine whether Mufao's alleged actions advanced any "legitimate goal of the

correctional institution," *Rizzo*, 778 F.2d at 532, or were arbitrary and capricious

and "unnecessary to the maintenance of order in the institution," *Franklin v.*

*Murphy*, 745 F.2d 1221, 1230 (9th Cir. 1984). Count XIV states a claim and may

proceed against Mufao.

## F.     ADA Claims:  Counts VIII, IX, X

Conklin alleges that Dr. Toyama's decision to discontinue his medical

memoranda in September 2018, and ADA Coordinator Assily's denial of his

requests for "comfort items," including extra pillows and a supportive mattress to

alleviate his degenerative condition, violated the ADA. *See* FAC, ECF No. 11 at

PageID #101-103.

> To state a claim under Title II of the ADA, a plaintiff must allege that:
>
> (1) he is an individual with a disability; (2) he is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) he was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of [his] disability.

*Simmons v. Navajo Cty.*, 609 F.3d 1011, 1021 (9th Cir. 2010) (citation omitted),

*overruled on other grounds by Castro v. Cty. of L.A.*, 833 F.3d 1060 (9th Cir.

2016) (en banc). The ADA defines a "public entity" to include any State or local

government, department, or agency, special purpose district, or other

instrumentality of a State or States or local government. 42 U.S.C. § 12131(1).

An individual is disabled if he has a "physical or mental impairment that

substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A).

The proper defendant for a claim brought under Title II of the ADA is the

public entity responsible for the alleged discrimination. *See Everson v. Leis*, 556

F.3d 484, 501 & n.7 (6th Cir. 2009) (collecting cases). Title II of the ADA does

not provide for suit against a public official acting in his individual capacity. *Id.*;

*see also Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002) (holding a

plaintiff cannot assert a claim under § 1983 against defendants in their individual capacities to vindicate rights created by the ADA).

To recover monetary damages under Title II of the ADA, a plaintiff must prove a defendant's intentional discrimination under a deliberate indifference standard, which "requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that . . . likelihood." *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1138-39 (9th Cir. 2001). An entity's failure to act "must be a result of conduct that is more than negligent, and involves an element of deliberateness." *Id.* at 1139. Punitive damages are not available under the ADA. *Barnes v. Gorman*, 536 U.S. 181, 189 (2002).

First, Conklin names Dr. Toyama and ADA Coordinator Assily in their individual capacities only. Thus, he fails to state a claim under the ADA.

Second, as alleged, Dr. Toyama's decision to rescind Conklin's special-needs memoranda appears to have been a medical decision regarding the level of assistive care Conklin required. A claim based on a medical decision to withhold treatment does not provide a basis on which to impose liability under the ADA. *See Burger v. Bloomberg*, 418 F.3d 882, 882 (8th Cir. 2005) (medical treatment decisions not a basis for ADA claims); *Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1144 (10th Cir. 2005) (medical decisions not ordinarily within scope of

ADA); *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) ("The ADA does not create a remedy for medical malpractice.").

Conklin provides insufficient facts to infer that either Dr. Toyama or Assily, if named in their official capacities, intentionally discriminated against him, with deliberate indifference to the possibility that harm was substantially likely if he was not provided comfort items or special needs assistance memoranda. Conklin's ADA claims against Dr. Toyama and ADA Coordinator Assily are DISMISSED with leave to amend.

## IV. <u>LEAVE TO AMEND</u>

The FAC is DISMISSED with leave granted to amend those claims that are not dismissed with prejudice on or before January 20, 2020. The amended pleading must address and cure the deficiencies in his claims noted above. Conklin may not expand his claims beyond those already alleged or add new claims, without explaining how those new claims relate to the claims already alleged.

Conklin must comply with the Federal Rules of Civil Procedure and the Local Rules for the District of Hawaii, particularly LR10.4, which requires an amended complaint to be complete in itself without reference to any prior pleading. An amended complaint must be short and plain, comply with Rule 8 of

39

the Federal Rules of Civil Procedure, and be submitted on the court's prisoner civil rights form. An amended complaint supersedes the preceding complaint. *See Ramirez v. Cty. of San Bernardino*, 806 F.3d 1002, 1008 (9th Cir. 2015). Defendants not renamed and claims not realleged in an amended complaint may be deemed voluntarily dismissed. *See Lacey v. Maricopa Cty.*, 693 F.3d 896, 928 (9th Cir. 2012).

## V. **CONCLUSION**

(1) The First Amended Complaint is DISMISSED in part as set forth above. Specifically, all claims are dismissed with the exception of Count XIV, which states a claim and may proceed. Count V, to the extent it claims denial of transfer and denial of grievance, is dismissed *without* leave to amend. All other dismissed claims are dismissed *with* leave to amend.

(2) Conklin may file an amended pleading on or before January 20, 2020, correcting the deficiencies in his claims as identified above.

IN THE ALTERNATIVE, Conklin may notify the court in writing on or before January 20, 2020, that he will proceed with only his retaliation claim in Count XIV against Defendant Francis Mufao. In that event, the court will direct the First Amended Complaint, limited to that claim only, to be served.

(3) If Conklin fails to timely file an amended pleading that cures the deficiencies in the claims dismissed in this Order, the court will direct Count XIV as alleged against Francis Mufao be served.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, December 23, 2019.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*Conklin v. Espinda, et al.*, No. 1:19 cv 00087 JMS RT; Scrng '19 Conklin19 87 jms (FAC dsm all cls lv amd, but RETAL)